## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BITCOIN DEPOT OPERATING LLC, ) | |
| Plaintiff – Counterclaim Defendant, ) | Case No. 1:25-cv-00721-GBW |
| ) | |
| v. ) | **DEFENDANT'S ANSWER, DEFENSES,** |
| ) | **COUNTERCLAIM, AND JURY** |
| FAREWAY STORES, INC. d/b/a ) | **DEMAND** |
| FAREWAY MEAT AND GROCERY, ) | |
| Defendant – Counterclaim Plaintiff. ) | **PUBLIC VERSION** |
| ) | |

The Defendant, Fareway Stores, Inc., d/b/a Fareway Meat and Grocery ("Fareway"), by and through its undersigned counsel, states the following for its Answer, Defenses, Counterclaim, and Jury Demand to the Complaint of the Plaintiff, Bitcoin Depot Operating LLC ("Bitcoin Depot"):

### NATURE OF THE ACTION

1.      Fareway admits Bitcoin Depot filed a Complaint filed on June 9, 2025 (the "Complaint") alleging a breach of contract. Fareway further admits that on February 24, 2025, Fareway unplugged Bitcoin Depot's Bitcoin ATMs located in its stores because they were instrumentalities of fraud. Fareway denies the remaining allegations contained in paragraph 1.

2.      Fareway admits that when it unplugged Bitcoin Depot's Bitcoin ATMs it informed Bitcoin Depot that it had done so and that Bitcoin Depot should come and pick them up within thirty days or it would consider the machines abandoned. Fareway also admits that it later advised Bitcoin Depot that it would not destroy the Bitcoin ATMs. Fareway denies the remaining allegations contained in paragraph 2.

3.      Fareway admits that the Bitcoin ATMs remained unplugged for three months, that it reconnected the Bitcoin ATMs on or about May 24, 2025, and that between February 24, 2025,

and May 24, 2025, the State of Iowa passed legislation regulating the operation of Bitcoin Depot's Bitcoin ATMs. Fareway further admits that its decision to reconnect Bitcoin Depot's Bitcoin ATMs was impacted in part by passage of the legislation. Fareway denies the remaining allegations contained in paragraph 3.

4.    Fareway denies the allegations contained in paragraph 4. Fareway affirmatively alleges that, as set forth in greater detail *infra*, it is excused from liability for unplugging Bitcoin Depot's Bitcoin ATMs as such machines with Bitcoin Depot's knowledge, consent, and facilitation were instrumentalities of fraud and illegal activity, and that Bitcoin Depot was operating its Bitcoin ATMs in violation of Iowa law as determined by the Iowa Attorney General.

## THE PARTIES

5.    Fareway admits the allegations contained in paragraph 5.

6.    Fareway admits the allegations contained in paragraph 6.

## JURISDICTION AND VENUE

7.    Fareway denies that the Court has jurisdiction over the subject matter of Bitcoin Depot's Complaint as the amount in controversy does not exceed $75,000.00. Fareway affirmatively alleges that the amount in controversy in its Counterclaim exceeds $75,000.00 and that this Court has jurisdiction under 28 U.S.C. § 1332 over the subject matter of Fareway's Counterclaim *infra*.

8.    Fareway denies the allegations contained in paragraph 8 that the parties consented to have the laws of the State of Delaware "apply for any disputes related to the Agreement," or that venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b). Fareway affirmatively alleges that the purported agreement between the parties states: "This Agreement shall be construed, interpreted, and enforced in accordance with the laws of the State of Delaware, without

regard to its conflict of law principles. . . . [T]he jurisdiction and venue for any legal proceeding to interpret or enforce this Agreement shall be in New Castle County Delaware." Fareway denies the remaining allegations contained in paragraph 8.

## FACTS

9.      Fareway admits the allegations contained in paragraph 9.

10.     Fareway admits the allegations contained in paragraph 10.

11.     Fareway admits the allegations contained in paragraph 11.

12.     Fareway affirmatively states that the Master Placement Agreement ("MPA") and Master Placement Agreement Form ("MPAF") speak for themselves. Fareway denies the remaining allegations contained in paragraph 12.

13.     Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations contained in paragraph 13.

14.     Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations contained in paragraph 14.

15.     Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations contained in paragraph 15.

16.     Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations contained in paragraph 16.

17.     Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations contained in paragraph 17.

18.     Fareway denies the allegations contained in paragraph 18.

19.     Fareway denies the allegations contained in paragraph 19.

20.     Fareway admits the allegations contained in paragraph 20.

21.     Fareway admits that Bitcoin Depot responded to Fareway's December 27, 2024, email on January 10, 2025. Fareway specifically denies that said response was "fulsome," that Bitcoin Depot's compliance framework is "robust," or that Bitcoin Depot was committed "to providing secure and compliant services" through its Bitcoin ATMs. Fareway denies the remaining allegations contained in paragraph 21.

22.     Fareway admits that on or about February 6, 2025, it requested copies of Bitcoin Depot's compliance policies. Fareway affirmatively states that it also reported in that same letter continued incidents of fraud experienced through Bitcoin Depot's Bitcoin ATMs and requested copies of the independent audits of Bitcoin Depot's compliance policies. Fareway further affirmatively states that although Bitcoin Depot purportedly attempted to send copies of its compliance policies to Fareway on or about February 11, 2025, subsequent investigation has revealed that Fareway's February 11, 2025, email was blocked by Fareway's email firewall system due to the email's size and that Fareway therefore did not receive copies of Bitcoin Depot's purported compliance policies on February 11, 2025. Fareway denies the remaining allegations contained in paragraph 22.

23.     Fareway admits that on February 24, 2025, it unplugged the Bitcoin ATMs. Fareway further admits that it communicated the disconnecting of power to the machines to Bitcoin Depot on February 24, 2025, and requested that if Bitcoin Depot did not arrange to pick up the machines and remove them within thirty days, Fareway would consider the machines abandoned. Fareway affirmatively states that the correspondence sent to Bitcoin Depot on February 24, 2025, contained additional complaints of fraudulent activity conducted through Bitcoin Depot's Bitcoin ATMs and of the service upon Fareway of an investigative subpoena by the Iowa Attorney General seeking information concerning instances of fraud conducted through

Bitcoin Depot's Bitcoin ATMs. Fareway denies the remaining allegations contained in paragraph 23.

24.    Fareway denies the allegations contained in paragraph 24.

25.    Fareway denies the allegations contained in paragraph 25. Fareway affirmatively states that Bitcoin Depot was in fact in breach of the MPA and MPAF.

26.    Fareway admits that on May 22, 2025, it contacted Bitcoin Depot to advise of its plans to plug in and reconnect the Bitcoin ATMs on May 24, 2025. Fareway further admits that the Bitcoin ATMs had been unplugged from February 24, 2025, until May 24, 2025. Fareway further admits that it took this action in part as a result of passage of legislation by the State of Iowa that finally regulated Bitcoin Depot in its operation of its Bitcoin ATMs in Fareway's stores, as partially alleged in paragraph 26. Fareway denies the remaining allegations contained in paragraph 26.

27.    Fareway denies the allegations contained in paragraph 27.

28.    Fareway denies the allegations contained in paragraph 28.

## COUNT I
### (Breach of Contract)

29.    Fareway realleges and incorporates by reference its answers to the allegations contained in paragraphs 1–28 as if set forth fully herein.

30.    Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations of paragraph 30.

31.    Fareway affirmatively states that the MPA and MPAF speak for themselves. Fareway denies the remaining allegations of paragraph 31.

32.    Fareway denies the allegations contained in paragraph 32.

33.    Fareway admits that it disconnected Bitcoin Depot's Bitcoin ATMs and covered them from view. Fareway denies the remaining allegations contained in paragraph 33.

34.    Fareway admits the allegations contained in paragraph 34.

35.    Fareway denies the allegations contained in paragraph 35. Additionally, as set forth in great detail in the Counterclaim *infra*, Fareway affirmatively states that Bitcoin Depot has breached the MPA and MPAF, assuming *arguendo* that MPA and MPAF documents constitute a valid and enforceable contract or agreement.

36.    Fareway denies the allegations contained in paragraph 36.

## DEFENSES

Fareway hereby states the following additional defenses to the Complaint, without assuming the burden of proof or persuasion where such burden rests on Plaintiff. Fareway reserves the right to supplement their defenses as discovery progresses and/or additional information comes to light:

1.    Bitcoin Depot fails to state a claim upon which relief may be granted.

2.    Bitcoin Depot's claims are barred by its own prior material breach of the MPA and MPAF, assuming *arguendo* that those documents constitute a valid and enforceable contract or agreement.

3.    Bitcoin Depot's claims are barred as it has operated its Bitcoin ATMs in the State of Iowa in violation of Iowa law.

4.    Bitcoin Depot's claims are barred, as is enforcement of any contract or agreement between the parties, as void as against public policy.

5.    Bitcoin Depot's claims are barred as assuming *arguendo* that a valid and enforceable contract or agreement exists, the terms of the contract are vague and ambiguous.

6.      Bitcoin Depot's claims are barred due to a lack of mutual assent and definite agreement on essential terms.

7.      Bitcoin Depot's claims are barred as assuming *arguendo* that a valid and enforceable contract exists, performance of the contract by Fareway was impossible without facilitating criminal conduct in violation of Iowa and federal law.

8.      Bitcoin Depot's claims are barred as assuming *arguendo* that a valid and enforceable contract exists due to the unconscionability of the contract.

9.      Bitcoin Depot's claims are barred by the doctrine of estoppel.

10.     Bitcoin Depot's claims are barred as it acted in bad faith and violated the implied covenant of good faith and fair dealing.

11.     Bitcoin Depot's claims are barred as it obtained Fareway's consent to any alleged contract or agreement between Bitcoin Depot and Fareway through fraud, deceit, and/or misrepresentation, as set forth in greater detail in the Counterclaim *infra* and incorporated by reference herein).

12.     Bitcoin Depot's claims are barred by the doctrines of unclean hands and/or *in pari delicto*.

13.     Bitcoin Depot's claims are barred by Bitcoin Depot's failure to abide by the conditions precedent contained the MPA and MPAF, assuming *arguendo* that those documents constitute a valid and enforceable contract or agreement.

14.     Bitcoin Depot's claims are barred by a failure to mitigate damages.

15.     Bitcoin Depot's alleged damages are offset by the damages they failed to mitigate.

16.     Bitcoin Depot's alleged damages are offset by the damages alleged in the Counterclaim *infra*.

17.    Bitcoin Depot's claims are barred by the doctrine of waiver.

## PRAYER FOR RELIEF

WHEREFORE, the Defendant, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, prays that the Court dismiss the Complaint of the Plaintiff, Bitcoin Depot Operating LLC, at the Plaintiff's cost and for such other and further relief as the Court deems just and proper.

## COUNTERCLAIM

The Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, states the following for its Counterclaim against the Counterclaim Defendant, Bitcoin Depot Operating LLC:

## PARTIES, JURISDICTION, AND VENUE

1.    Counterclaim Plaintiff Fareway Stores, Inc. d/b/a Fareway Meat and Grocery ("Fareway") is an Iowa corporation with its principal place of business in Polk County, Iowa.

2.    Upon information and belief, Counterclaim Fareway Bitcoin Depot Operating, LLC ("Bitcoin Depot") is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.

3.    This Court has subject matter jurisdiction over this Counterclaim under 28 U.S.C. §1332, as the matter involves parties of different states and the amount in controversy exceeds $75,000.00.

4.    Venue is proper in this Court in that the counts contained in the Counterclaim are either compulsory counterclaims under Federal Rule of Civil Procedure 13(a) or permissive counterclaims under Federal Rule of Civil Procedure 13(b), as they involve the same parties as the primary suit and are based in substantial part upon the same facts as Fareway's defenses to Bitcoin Depot's breach of contract claim in the underlying Complaint.

## FACTS

5.      Fareway is an Iowa-centered corporation with grocery stores in Iowa, Illinois, Minnesota, South Dakota, Nebraska, Missouri, and Kansas.

**A.  Information about Bitcoin Depot.**

6.      Bitcoin Depot is a publicly traded company (trading under the NASDAQ Exchange ticker symbol of "BTM").

7.      Bitcoin Depot boasts that it is the world's largest Bitcoin ATM network, with more than 8,000 Bitcoin ATMs in North America.

8.      Bitcoin Depot's business model centers almost exclusively around its Bitcoin "ATMs" and depends almost exclusively upon its placement of its Bitcoin ATMs in high-traffic retail locations such as grocery stores, convenience stores, liquor stores, etc.

9.      To place its Bitcoin ATMs in these high-traffic retail locations, Bitcoin Depot must convince retail establishments to "host" the ATMs, usually renting a small space within the retail establishment at which the ATM is placed.

10.      A Bitcoin "ATM" is a standalone kiosk through which persons and entities can purchase Bitcoin.



11.    To purchase Bitcoins through the Bitcoin ATM, a customer inserts cash into the machine and then uses the machine to purchase Bitcoins.

12.    Bitcoin Depot markets these kiosks to the public and to its retail hosts as "ATMs," an acronym for "automated teller machine."

13.    To build trust with consumers and hosts, Bitcoin Depot purposely calls its kiosks "ATMs" to psychologically connect its kiosks with conventional bank-operated ATMs, hoping that customers and hosts will feel more comfortable with the machine based upon their prior and current experiences with bank-operated ATMs.

14.    Unlike bank-operated ATMs, however, Bitcoin Depot's Bitcoin ATMs operate much differently.

15.    A bank-operated ATM is a machine through which a customer can withdraw cash from their own bank account.

16.    The vast majority of Bitcoin Depot's Bitcoin ATMs, however, can only receive cash.

17.     The vast majority of Bitcoin Depot's Bitcoin ATMs cannot dispense cash to a customer who wishes to sell his/her Bitcoins and receive the proceeds in cash.

18.     Upon information and belief, none of Bitcoin Depots Bitcoin ATMs in Fareway's stores can dispense cash.

19.     The inability of a user to receive cash from a Bitcoin ATM plays a role in Bitcoin Depot's facilitation of fraudulent and/or illegal scam transactions in that once the cash is inserted into the Bitcoin ATM, the machine does not have the physical capability of dispensing the cash back to the consumer if the consumer figures out that he/she is a victim of a scam.

**B.  The Scam.**

20.     The scam begins with a scammer contacting the victim and demanding or requesting money, often under the false pretenses of threat of jail, harm to the victim or the victim's family, seizure of the victim's bank accounts, or a take-over of the victim's technology.

21.     The victim, acting under duress because of the scammer's threats, complies with the instructions given by the scammer.

22.     The victim is instructed by the scammer to obtain a large amount of cash and take it to a location that has a Bitcoin ATM.

23.     Once at the location with the Bitcoin ATM, the victim is instructed by the scammer on how to access the machine and initiate a transaction.

24.     Importantly, the scammer stays in contact with the victim via cell phone during the entire transaction, instructing the victim how to complete the transaction, including circumvention of any warnings, disclaimers, terms and conditions, or verifications provided or required of the operator of the Bitcoin ATM.

25.     The scammer then instructs the victim to insert a large amount of cash into the Bitcoin ATM.

26.     Through the constant cell-phone contact between the scammer and the victim, the scammer instructs the victim how to answer various questions and/or navigate through the Bitcoin ATM process, questions, warnings, disclaimers, terms and conditions, and other so-called "compliance" procedures to complete the transaction.

27.     Once the victim initiates the transaction, following the scammer's instructions, and inserts all the cash, the scammer sends the victim a QR code that represents the scammer's digital wallet.

28.     Because of the anonymous nature of the blockchain that represents the Bitcoin, it is frequently difficult if not impossible to objectively confirm the identity of the owner of the digital wallet into which Bitcoins are transferred.

29.     The scammer then instructs the victim to purchase Bitcoin through the Bitcoin ATM and scan the scammer's QR code into the Bitcoin ATM.

30.     The Bitcoin ATM operator and the Bitcoin ATM then deposits the purchased Bitcoin into the scammer's digital wallet, thus completing the scam, effectively depriving the victim of a large amount of cash and providing the scammer with the Bitcoins purchased through the Bitcoin ATM.

31.     Because of the nature of Bitcoin Depot's business model and the way Bitcoin is bought and sold, the purchase of the Bitcoins cannot be reversed, effectively making the victim's loss permanent.

**C.  Bitcoin Depot Touts Trust as the Key to Its Business Model.**

32.     As it marketed its Bitcoin ATMs, Bitcoin Depot put "trust" at the center of its marketing message to the public.

33.     Bitcoin Depot marketed itself as "The #1 Bitcoin ATM" and encouraged the public to "Tap into the world's largest and ***most trusted*** Bitcoin ATM network." https://bitcoindepot.com/bitcoin-atm/ (emphasis added).

34.     As part of its sales pitch, Bitcoin Depot claimed that through its Bitcoin ATMs, its mission was to bring "Crypto to the Masses.™" [1]

35.     In its own blog post placed to the public in November 2023, Bitcoin Depot promoted "Security and Trust in Bitcoin With Bitcoin Depot ATMs." *See* https://bitcoindepot.com/bitcoin-atm-info/security-and-trust-in-bitcoin-with-bitcoin-depot-btms/. A true and correct copy of the blog post is attached and incorporated as **Exhibit A**.

36.     Bitcoin Depot emphasized not only the important of trust but also promoted its alleged role in making sure transactions were safe and secure "In the quickly changing world of crypto, trust is a precious commodity. With the rising interest in digital assets, making a safe and secure environment for users is very important. Bitcoin Depot, a leading player in the Bitcoin ATM market, has taken significant strides in building trust with its customers."  Ex. A.

37.     Under the heading, "KYC/AML Compliance Establishes Security and Trust in Bitcoin," (*see* Ex. A) Bitcoin Depot told the public:

> a.  Bitcoin Depot ATMs require customers to complete Know Your Customer verification process to prevent unauthorized or fraudulent transactions.

---

[1]     Bitcoin Depot felt this mission was so important it trademarked the phrase. U.S. Patent & Trademark Reg. No. 7,116,248, registered July 18, 2023.

b. Bitcoin Depot complies with all relevant Know Your Customer and Anti-Money Laundering regulations in the jurisdictions where its Bitcoin ATMs were located, "ensuring that all Bitcoin ATMs operate within legal boundaries."

c. That by following these regulations, Bitcoin Depot was doing its part to reduce the risk of cryptocurrency use for illegal activities.

d. Bitcoin Depot told the public that because of its compliance system, "In fact, Bitcoin Depot ATMs have ***never been involved in any kind of fraudulent activity or scandal***." (emphasis added).

38. Based upon its compliance system, procedures, policies and personnel, Bitcoin Depot promised, "Whether you're a seasoned crypto enthusiast or a newcomer to the space, you can feel confident in your purchases with Bitcoin Depot. Security and trust in Bitcoin are at the forefront of our operations." Ex. A.

**D. The Bitcoin Depot Sales Pitch.**

39. In late 2023, Bitcoin Depot approached Fareway seeking to install its Bitcoin ATMs in some of Fareway's grocery stores.

40. As part of its sales pitch, Bitcoin Depot claimed that because of the increasing popularity of and interest in Bitcoin, installation of its Bitcoin ATMs would increase customer traffic in Fareway's stores.

41. As part of its sales pitch, Bitcoin Depot claimed that because Bitcoin Depot was a "money transmitter" under federal and state law, it was in a highly regulated industry and its

Bitcoin ATMs, and the transactions conducted through those ATMs were therefore highly regulated.[2]

42.     As part of its sales pitch, Bitcoin Depot promoted its Bitcoin ATMs as a way to buy cryptocurrency through "quick and secure transactions." https://bitcoindepot.com/who-we-are/.

43.     As part of its sales pitch, Bitcoin Depot promoted its "robust compliance procedures" as a key driver of increased traffic and business to its retail partners, including Fareway.

44.     In December 2023, Bitcoin Depot provided Fareway with a presentation for ████ █████████████████████████████████████████████████████████████ A true and correct copy of the presentation is attached and incorporated as **Exhibit B**.

45.     In the presentation, Bitcoin Depot promised Fareway that it ensured that its customers ████████████████████████████ (emphasis added):

_____

[2]     In fact, in legal proceedings involving cash seized by law enforcement during investigation of scam transactions, Bitcoin Depot portrays itself as a business that is "highly regulated."  *See* Affidavit of Bitcoin Depot Assistant General Counsel Joel Rimby filed February 9, 2024, In the Iowa District Court for Linn County, Court File No. SPCR153335.



46.    Bitcoin Depot then bragged about how its compliance team ███████████████

███████████



47.    Directly to Fareway, Bitcoin Depot promoted its "robust compliance:"

16



48.     All these comments were designed, intended, and communicated for the purpose of giving hosts, and specifically Fareway, the sense that transactions conducted through Bitcoin Depot's Bitcoin ATMs would be safe, secure, and legal.

49.     All these comments were designed, intended, and communicated for the purpose of giving hosts, and specifically Fareway, the sense that Bitcoin Depot's "robust compliance" system, procedures, policies, and personnel was sufficient to not only comply with Bitcoin Depot's legal requirements, but was also sufficient to detect and prevent illegal activity conducted through its Bitcoin ATMs.

50.     Bitcoin Depot made these statements with the purpose of convincing Fareway to allow Bitcoin Depot to install its Bitcoin ATMs in Fareway's stores.

51.     These statements were demonstrably and intentionally false and contradicted Bitcoin Depot's internal communications and representations to regulators.

**E.  The Master Placement Agreement.**

52.     On or about April 9, 2024, Fareway executed the Master Placement Agreement ("MPA") with Bitcoin Depot.  A true and correct copy of the MPA is attached and incorporated as **Exhibit C**.

53.     Also, on or about April 9, 2024, Fareway executed the Master Placement Agreement Form ("MPAF") by which it agreed to allow Bitcoin Depot to install its Bitcoin ATMs in 66 of Fareway's stores.

54.     Under the express terms of the MPA, Fareway represented and warranted that it

███████████████████████████████████████████████████████████

███████████████     MPA, ¶ 21.d (emphasis added).

55.     Under the express terms of the MPA, Bitcoin Depot prohibited Fareway from:

   a.   interacting with or directly providing assistance to any user of Bitcoin Depot's Bitcoin ATMs (MPA, ¶ 2.4);

   b.   providing any financial or legal advice to any user of a Bitcoin Depot ATM or customer of Bitcoin Depot (MPA, ¶ 2.4);

   c.   adding any advertising or marketing material to or around the Bitcoin ATM (MPA, ¶ 2.5); and

   d.   adding claims or additional advertising materials to Bitcoin Depot's signage. MPA, ¶ 2.12.

56.     The MPA also set forth the following representations and warranties by Bitcoin Depot:

   a.   Bitcoin Depot will maintain anti-money laundering, Know Your Customer, and Bank Secrecy Act compliance program;

    b.   Bitcoin Depot is in good standing in all jurisdictions in which its Bitcoin ATMs are located without violation of applicable law, rule, regulation or other binding legal authority; and

    c.   Bitcoin Depot is exclusively responsible for all aspects of compliance with any local, state, or federal law or regulation relating to the operation of its Bitcoin ATMs.

**F.  Fareway's Experience.**

57.     Upon execution of the MPA and MPAF, Bitcoin Depot proceeded to install its Bitcoin ATMs in Fareway's stores.

58.     Within a relatively short time following installation of Bitcoin Depot's Bitcoin ATMs, Fareway store employees began noticing unusual behavior from the people who would come into the stores to use the Bitcoin ATMs.

59.     On most occasions, the Bitcoin ATM users ("Users") would be on a cell phone throughout the entire time it took to conduct a transaction.

60.     On most occasions, the Users appeared largely unfamiliar with the Bitcoin ATM and were confused by its operation.

61.     On most occasions, the Users appeared to be taking direction from the person on the other end of the cell phone.

62.     On most occasions, the Users had large amounts of cash in their possession and would spend an inordinate amount of time stuffing cash into the Bitcoin ATM one bill at a time, all while on their cell phone taking direction from whomever was on the other end.

63.     Barred by the MPA from interacting with or providing assistance or advice to the Users, Fareway employees were forced to sit back helplessly and observe these events as the transactions took place.

64.     On November 6, 2024, law enforcement executed a search warrant at the Bitcoin ATM located in Fareway's store in Ankeny, Iowa. A true and correct copy of the search warrant is attached and incorporated as **Exhibit D**.

65.     According to the application for the search warrant, the victim had inserted $12,000 of cash into the Bitcoin ATM at that location in response to a scam. A true and correct copy of the search warrant application is attached and incorporated as **Exhibit E**.

66.     According to the application for the search warrant, the victim believed she was depositing the Bitcoin purchased through the Bitcoin ATM into *her* digital wallet. *Id.*

67.     Upon information and belief, victims of fraudulent and/or illegal scams facilitated by and through Bitcoin Depot's Bitcoin ATMs are unaware that the digital wallet given to them by the scammer is actually owned by the scammer and not by the victim, thereby easily evading Bitcoin Depot's "verification" process of verifying the owner of the digital wallet into which it deposits the purchased Bitcoins.

68.     Increasingly over the next several months following installation of the Bitcoin ATMs, Fareway employees learned from the victims themselves or often from law enforcement that the above-described occurrences were scam transactions by which the Users were being scammed out of their cash.

69.     Fareway received multiple complaints from individuals who were upset that Fareway would have Bitcoin ATMs in its stores because of the frequency and level of fraudulent and/or illegal scams taking place through the machines.

70.     Some individuals organized a boycott of Fareway because of the presence of Bitcoin Depot's ATMs in Fareway's stores and the frequency and level of fraudulent and/or illegal scams taking place through the machines.

## G. Fareway Communications with Bitcoin Depot.

71.     On December 27, 2024, Fareway again contacted Bitcoin Depot, notifying it of the problems experienced by Fareway locations with fraudulent and scam activity occurring through use of Bitcoin Depot's Bitcoin ATMs.

72.     In that communication, Fareway requested that Bitcoin Depot put a daily transaction limit on its Bitcoin ATMs to limit the amount of cash a scam victim could lose on any given day and to provide refunds for fraud/scam transactions.

73.     Bitcoin Depot responded on January 10, 2025, with its typical "we have 'robust compliance framework'" jargon, which was merely a smokescreen for their blatant refusal to do anything to address Fareway's legitimate concerns for its customers concerning the illegal activity taking place using Bitcoin Depot's Bitcoin ATMs.

74.     Bitcoin Depot refused to comply with Fareway's reasonable requests to limit daily transaction amounts and provide refunds for fraud/scam transactions.

75.     Fareway thereafter continued to observe several more incidents of fraudulent scam activity taking place through Bitcoin Depot's Bitcoin ATMs.

76.     On February 6, 2025, Fareway again contacted Bitcoin Depot to advise it of the continuing illegal scam activity facilitated through the Bitcoin ATMs.

77.     In its February 6, 2025, letter, Fareway requested copies of Bitcoin Depot's anti-money laundering, Know Your Customer, and Bank Secrecy Act policies, as well as the

independent third-party audits of those policies (intended by law to gauge the effectiveness of the policies), all of which Bitcoin Depot was required by law to have.

78.    Between February 6, 2025, and February 22, 2025, Fareway continued to observe illegal scam transactions taking place on the Bitcoin Depot Bitcoin ATMs in its stores.

79.    On February 18, 2025, Fareway was served with an investigative subpoena from the Iowa Attorney General as part of its investigation into Bitcoin/Cryptocurrency ATM/Kiosks and potential violation of the Iowa Consumer Fraud Act.  A true and correct copy of the February 18, 2025 subpoena is attached and incorporated as **Exhibit F**.

80.    On February 20, 2025, Fareway was informed by a member of the Iowa Lottery Division investigation team that Bitcoin ATM scams in five different Fareway stores had been the subject of an internal investigation team meeting, which was reported by the investigator to be occurring at the rate of one per week.

81.    Fareway also became aware of a class action lawsuit initiated in South Carolina in March of 2024 against Bitcoin Depot and Circle K (a convenience store chain host of many of Bitcoin Depot's Bitcoin ATMs) in which Circle K as the host was alleged to be liable for not taking sufficient steps to prevent the fraud and/or illegal scam transactions taking place through Bitcoin Depot's Bitcoin ATMs. A true and correct copy of the summons and complaint in *Mooneyham v. Bitcoin Depot, Inc., et al.*, No. 2024-CP-4001549 (S.C. Ct. Com. Pl.) is attached and incorporated as **Exhibit G**.

82.    The *Mooneyham* case raised significant concerns for Fareway about the extent of its potential liability to fraud/scam victims, even though the MPA expressly prohibited Fareway from taking effective steps to "interfere" with victims' Bitcoin ATM transactions despite knowing they may or were fraudulent or illegal scams.

83.    After the close of business on February 24, 2025, having not received any of the requested compliance policies or audits from Bitcoin Depot,[3] Fareway unplugged the Bitcoin ATMs to protect its customers from the illegal scam activity that Bitcoin Depot refused to make further effort to prevent or to stop.

84.    Despite Bitcoin Depot's refusal to take reasonable steps on its own to stop the fraud and scams taking place through its Bitcoin ATMs, on March 11, 2025, Bitcoin Depot initiated legal action in Delaware Chancery Court in an effort to judicially force Fareway to turn the Bitcoin ATMs back on and thereby sit by helplessly as users of Bitcoin Depot's Bitcoin ATMS were victimized by scammers in Fareway's stores.

85.    The Delaware Chancery Court refused to order Fareway to plug the Bitcoin ATMs back in.

86.    Nevertheless, Bitcoin Depot persisted in its legal threats over Fareway's self-help to protect itself and the many victims of fraud and/or scams conducted through Bitcoin Depot's Bitcoin ATMs.

87.    Fareway passed along to Bitcoin Depot several complaints it had received about the presence of Bitcoin Depot's Bitcoin ATMs in its stores and the frequency and level of fraudulent and/or illegal scams facilitated by the Bitcoin ATMs. Fareway asked Bitcoin Depot to contact each complaining person to rectify, mitigate, and remediate the complainers' complaints

---

[3]    Although subsequent communications with Bitcoin Depot and internal investigation revealed that Bitcoin Depot attempted to email its compliance policies on February 11, 2025, the size of the email caused it to be rejected by Fareway's email firewall with an automated message sent back to Bitcoin Depot that the email had not been delivered. Despite receiving the automated message that its email had not been delivered to Fareway, no further attempt was made by Bitcoin Depot to re-send the policies until after February 24, 2025. To date, the independent third-party audits or reviews of the policies have never been provided.

about Fareway. Bitcoin Depot refused to contact any complaining person who was not a direct customer of Bitcoin Depot.

**H.  Bitcoin Depot's Non-"Robust" Compliance System.**

88.     Eventually, Fareway was able to obtain from Bitcoin Depot documentation of Bitcoin Depot's internal compliance program, and review shows that Bitcoin Depot's actual programs fall well short of its representations.

89.     Throughout its public-facing statements and statements to Fareway specifically, Bitcoin Depot has consistently touted its "robust compliance" system to convince others that its Bitcoin ATMs are safe and secure and that it is doing everything possible to detect and prevent fraudulent and/or illegal scam transactions.

90.     Federal law, as embodied by the federal Bank Secrecy Act and its regulations, and USA Patriot Act and its regulations, form the basis for financial institutions to help protect their customers from fraudulent and/or illegal scam activity.

91.     At the core of these requirements is the requirement that financial institutions perform **_effective_** customer due diligence "so that they understand who their customers are and why type of transactions they conduct" as a "critical aspect of combating all forms of illicit financial activity, from terrorist financing and sanctions evasion to more traditional financial crimes, including money laundering, fraud and tax evasion."  *See* 31 C.F.R. pts. 1010–24 & 1026 (Customer Due Diligence Requirements for Financial Institutions) (2016).

92.     The Financial Crimes Enforcement Network ("FinCEN") includes four elements of customer due diligence to comprise the minimum standards for an **_effective_** anti-money laundering program:

        a.   Identifying and verifying the identity of customers;

b.  Identifying and verifying the identity of beneficial owners of legal entity customers;

c.  Understanding the nature and purpose of customer relationships; and

d.  Conducting ongoing monitoring.

93.  To meet FinCEN's minimum requirements for a Customer Identification Program ("CIP"), a financial institution's CIP "must contain procedures for opening an account that specify the identifying information that will be obtained from each customer."  *See* 31 C.F.R. § 1020.220(a)(2)(i)(A).

94.  Under FinCEN's minimum CIP requirements, the following information must be obtained from the customer ***prior to*** opening ***an account***:

a.  Name;

b.  Date of birth;

c.  Address;

d.  Identification number, i.e., taxpayer identification number.

*See* 21 C.F.R. § 1020.220(a)(2)(i)(A)(1)–(4).

95.  FinCEN regulations permit an institution to rely upon another institution for performance of parts of its CIP procedures so long as the other institution is, among other requirements, has an anti-money laundering policy, is regulated by a Federal functional regulator, and enters into a contract requiring it to certify annually to the institution that it has implemented its anti-money laundering program and will perform the requirements of the institution's CIP.  31 C.F.R. § 1020.220(a)(6).

96.  To establish a Bitcoin Depot digital wallet to purchase Bitcoin through a Bitcoin Depot ATM, Bitcoin Depot only requires a cell phone number.  A screenshot of an actual Bitcoin

Depot digital wallet profile upon establishing new account with Bitcoin Depot shows this is the case:



97.     Rather than collect the required information at the time the digital wallet account is created, Bitcoin Depot's Know Your Customer policy instead purports to be "risk-based" to allow it to "know and understand its customers and their associated financial dealings." *Id.* ¶ 4. A true and correct copy of Bitcoin Depot's Know Your Customer policy is attached and incorporated as **Exhibit H**.

98.     According to paragraph 5 of its Know Your Customer policy, Bitcoin Depot apparently bases its determination of the "risk" level of the customer ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ involved:

      a.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

          ▮▮▮▮▮

b. 

*See* Ex. H.

99.    Although Bitcoin Depot purports to have a daily transaction limit of $15,000 pursuant to its Know Your Customer policy, upon information and belief, Bitcoin Depot has permitted and conducted transactions at its Bitcoin ATMs in excess of its daily transaction limit.

100.    Bitcoin Depot's Know Your Customer policy has ████████████████████ ████████████████ to be placed:



101.    According to Bitcoin Depot's Know Your Customer policy, the only information Bitcoin Depot's policy requires it to collect for ████████████████ are:



102.    Bitcoin Depot's Know Your Customer policy for ███████ customers fails to meet the minimum standards established by FinCEN under federal law, in that its Know Your Customer policy does not require the customer's address, date of birth, or taxpayer identification number.

103.    Bitcoin Depot regularly misstates to the public the required "Know Your Customer" information that must be collected under the FinCEN regulations:

    a.    https://bitcoindepot.com/bitcoin-atm-info/what-is-kyc/ (posted 5/18/2023):

### What are the KYC requirements & verifications in the crypto industry?

KYC requirements vary depending on the jurisdiction and the type of business involved. Generally, crypto businesses are required to collect and verify the following information from their customers:

1. Full name
2. Date of birth
3. Residential address

In order to verify this information, they may ask for documents such as your driver's license or passport. You may also be required to provide additional documentation for customer due diligence or enhanced due diligence, which could include employment information, source of funds, or account purpose.

In addition to collecting this information, crypto businesses are required to assess the risk of doing business with each customer. This involves conducting a risk assessment based on factors such as the customer's location, transaction history, and the type of cryptocurrency being transacted.

b.  https://bitcoindepot.com/bitcoin-atm-info/bitcoin-security-kyc-best-practices-and-beyond/ (posted 12/27/2024) (emphasis added):

**What Is Know Your Customer (KYC)?**

Know Your Customer requirements help prevent financial crimes like money laundering, fraud, and terrorism financing while protecting legitimate customers.

Depending on how much you purchase at a BTM, these verification requirements can vary.

For example, basic transactions under a certain limit may only require a phone number and email address. Larger purchases may require additional verification requirements like a valid ID.

c.  https://bitcoindepot.com/bitcoin-atm-info/kyc-and-bitcoin-atm-limits/   (posted 2/19/2025) (emphasis added):

## Types of KYC Requirements

Bitcoin ATM operators implement a spectrum of KYC requirements, ranging from basic to stringent levels of verification.

Basic KYC requirements are just that, basic.

Usually, this means you'll need to provide a minimal amount of personal information:

- Phone number
- Email address

This level of verification is suited for smaller purchase amounts. This makes it faster for users who just want to purchase a little while still keeping things safe.

Next is enhanced KYC.

This is a more comprehensive verification process, often including:

- Government-issued IDs* (learn more about ID types at *state.gov*)
- Proof of address

As you may have guessed, these requirements are necessary for higher transaction limits. They provide a higher level of security but may be more time-consuming and intrusive for users.

104.    Bitcoin Depot's KYC for ▮▮▮▮ customers requires the following information:



105.    Although closer to the FinCEN minimum CIP requirements, Bitcoin Depot's KYC

▮▮▮▮ requirements also fail to meet FinCEN's minimum CIP requirements, in that Bitcoin

Depot fails to require the customer's taxpayer identification number. *See supra* ¶ 103(b).

106.    Only upon attempting a transaction at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ does Bitcoin Depot's KYC require a

taxpayer identification number, i.e., social security number.  *See* Ex. H.

107.    Bitcoin Depot's Know Your Customer policy also asserts that Bitcoin Depot will



▮▮▮▮▮▮. Ex. H, ¶ 6.

108.    In some instances, Bitcoin Depot will use ▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮. *Id.*

109.    However, Bitcoin Depot's KYC policy readily admits that for some transactions,

the software will be able to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *Id.*

110.    Bitcoin Depot's KYC, although proclaimed profusely to be "robust" throughout its promotions to the public and to Fareway specifically, fail even the most basic "You're your Customer" requirements.

**I.  The Iowa Attorney General Takes Action.**

111.    Eight days after serving Fareway with its investigative subpoena, on February 26, 2025, the Iowa Attorney General filed a lawsuit against Bitcoin Depot alleging multiple violations of the Iowa Consumer Fraud Act ("AG Petition").  A true and correct copy of the AG Petition is attached and incorporated at **Exhibit I**.[4]

112.     In the AG Petition, Bitcoin Depot is accused of,

    a.  selling Bitcoin through its BTMs in a manner that allows for prevalent scam transactions to be processed constitutes an "unfair practice" that is unlawful under Iowa Code § 714.16(2);

    b.  deceiving its customers by failing to conspicuously present Iowa consumers with either the price of Bitcoin or the fees they pay, hiding the terms regarding the cost of Bitcoin and fees in lengthy, complex documents with inapplicable terms, and instructing its customer service representatives to evade and misdirect questions about cost;

    c.  deceiving its customers by misrepresenting the existence or nature of its refund policy; and

    d.  committing the above acts against older individuals.

*See* Ex. I.

---

[4]    Redactions in the AG Petition are as supplied.

113.    In the AG Petition, the Iowa Attorney General supported its claims with the following salient facts:

    a.  Scam transactions processed through Bitcoin Depot's Iowa ATMs between October 10, 2021, and July 26, 2024, totaled at least $7,243,991 (Ex. I, ¶ 14);

    b.  Bitcoin Depot's policies for use of its ATMs do not adequately protect Iowa consumers or prevent scam transactions (*Id.* ¶ 15);

    c.  Bitcoin Depot fails to follow its own inadequate policies (*Id.*);

    d.  Bitcoin Depot used deceptive practices to hide from consumers the fact that it was charging consumers up to 23% more for Bitcoin than the readily available market price for Bitcoin (*Id.* ¶ 16);

    e.  Bitcoin Depot deceptively designed and implemented its refund policy to hide it from consumers, and often times wrongfully denied defrauded consumers refunds (*Id.* ¶ 17);

    f.  During the period of investigation (10/10/2021 – 7/26/2024) ("Investigation Period"), hundreds of Iowans complained to Bitcoin Depot about its Bitcoin ATMs being used for scam transactions (*Id.*);

    g.  The Attorney General's office spoke with 34 of the top 50 Bitcoin Depot Bitcoin ATM users by transaction amount during the Investigation Period and ALL 34 confirmed the transactions they processed through the Bitcoin Depot Bitcoin ATMs were scam transactions, representing over $2.4 million worth of illegal transactions (*Id.* ¶ 32);

    h.  The Attorney General's analysis of the information and data it had collected during the Investigation Period caused the AG to conclude that more than one-

half of all of the money taken in by Bitcoin Depot through its Bitcoin ATMs in Iowa were scam transactions (*Id.* ¶ 34);

i.  Bitcoin Depot's records as obtained by the Attorney General's investigation revealed that Bitcoin Depot and its policies were unable to prevent scam transactions, causing Iowans "substantial and unavoidable injury" (*Id.* ¶ 42);

j.  Many Bitcoin Depot Bitcoin ATM users had multiple accounts, a sign of fraudulent and illegal scam transactions widely known in the industry and by Bitcoin Depot (*Id.* ¶ 48.b.);

k.  Multiple Bitcoin Depot Bitcoin ATM users sent money to the same digital wallet, a sign of fraudulent and illegal scam transactions widely known in the industry and by Bitcoin Depot (*Id.* ¶ 48.c.);

l.  Some Bitcoin Depot Bitcoin ATM users have multiple Bitcoin addresses linked to multiple digital wallets, a sign of fraudulent and illegal scam transactions widely known in the industry and by Bitcoin Depot (*Id.* ¶ 48.d.);

m.  Bitcoin Depot ignored industry-recognized red flags and warning signs related to emails (*Id.* ¶ 48.e.);

n.  Bitcoin Depot's anti-fraud policies were either inadequate or ineffective to detect and prevent fraudulent and illegal scam transactions due to Bitcoin Depot's failure to follow and enforce those policies (*Id.* ¶ 52);

o.  Bitcoin Depot's warnings to users were ineffective to prevent fraudulent and illegal scam transactions (*Id.* ¶¶ 63–65);

p.  Bitcoin Depot failed to telephone users during the process of transactions that should have and would have raised red flags to Bitcoin Depot that the

transactions were fraudulent and/or illegal scam transactions, a step that would in many instances have either caused the user to stop and cancel the transaction or that should have caused Bitcoin Depot to refuse to process the transaction (*Id.* ¶ 65);

q.   Bitcoin Depot was failing to fully utilize its ability to track fraudulent and illegal scam transactions (*Id.* ¶ 79.a.);

r.   Bitcoin Depot failed to use its camera surveillance capabilities to determine if a fraudulent and/or illegal scam transaction was taking place (*Id.* ¶ 79.b.);

s.   Bitcoin Depot's contracts [such as the MPA with Fareway] prohibited store personnel from intervening to prevent a fraudulent and/or illegal scam transaction from taking place (*Id.* ¶ 79.d.);

t.   Bitcoin Depot was hiding the true cost of the transactions from its consumers (*Id.* ¶¶ 8–110); and

u.   Bitcoin Depot stopped providing users with a written receipt so the users could verify the details of the transaction.  *Id.* ¶ 102.

114.   The AG Petition also attached an Appendix with many pages of factual allegations and evidence supporting the allegations contained in the AG Petition ("AG Petition Appendix"). A true and correct copy of the AG Petition Appendix is attached and incorporated as **Exhibit J**.

115.   Based upon these and many other factual allegations, the Iowa Attorney General through the AG Petition asserted a claim of violation of Iowa's Consumer Fraud Act, Iowa Code § 714.16 in the following regards:

a. Bitcoin Depot's sale of Bitcoin through its Bitcoin ATMs that allow for prevalent scam transactions is an unfair practice under the Iowa Consumer Fraud Act;

b. Bitcoin Depot deceived users about the price of Bitcoin purchased through its Bitcoin ATMs;

c. Bitcoin Depot misrepresented its refund policy to users;

d. Bitcoin Depot's refund policy is deceptive and unlawful under the Iowa Consumer Fraud Act; and

e. Bitcoin Depot's violations of the Iowa Consumer Fraud Act were committed against older users for which enhanced penalties apply.

**J. The Iowa Legislature Takes Action.**

116. Prior to and at the execution of the MPA and MPAF, cryptocurrency transactions conducted through automated kiosks or Bitcoin ATMs were largely unregulated by the State of Iowa.

117. Despite Bitcoin Depot's pervasive public comments that the Bitcoin ATM industry was "highly regulated," the State of Iowa:

a. Had no limitations on the amount of cash a person, especially a victim of fraud and/or illegal scam activity, could deposit into a Bitcoin ATM;

b. Had no limitations on the amount of fees a Bitcoin ATM operator could charge to a user;

c. Had no requirements on disclosures to be provided to a user regarding use of the Bitcoin ATM or the transactions conducted through the Bitcoin ATM;

d. Did not require the user to be given a receipt for the transaction; or

    e.   Did not require Bitcoin ATM operators to provide refunds for fraudulent or illegal scam transactions.

118.    On February 18, 2025, the Iowa Senate introduced SSB1142, an act relating to digital financial transaction kiosks.

119.    SSB1142 proposed to:

    a.   Limit daily Bitcoin ATM transactions for any particular user to $1,000 per day;

    b.   Limit fees allowed to be charged by a Bitcoin ATM operator to the greater of $5.00 or 15% of the U.S. currency equivalent of the value of the digital financial asset involved in the transaction;

    c.   Require specific disclosures be provided to all users of Bitcoin ATMs; and

    d.   Require receipts be given to any user of Bitcoin ATMs.

120.    On March 26, 2025, the Iowa Senate amended SSB1142 (then-known-as SF449) to add a requirement that Bitcoin ATM operators provide refunds to victims of fraud and/or scam transactions and passed SF449 by a vote of 45-2.

121.    On May 12, 2025, the Iowa House passed SF449 by a vote of 77 to12.

122.    Throughout the legislative process, Bitcoin Depot vehemently opposed the legislation and its regulations, claiming in substantial part that the regulations would in essence put it out of business in Iowa because it would no longer be profitable to operate its Bitcoin ATMs under SF449's regulations.

123.    Despite Bitcoin Depot's strenuous efforts to keep Iowa's Bitcoin ATM industry largely unregulated and to protect its enormous profits including those gained through fraudulent and/or illegal scam transactions, on May 19, 2025, Iowa Governor Kim Reynolds signed SF449, which became codified as Iowa Code § 533C.1004.

124.    As a result of the passage of SF449, Iowa Code § 533C.1004 provides substantial protection for victims and potential victims of fraudulent and/or illegal scam activity facilitated through Bitcoin ATMs.

**K. Fareway Turns Machines Back On.**

125.    With the passage of SF449 and the protections for Iowa victims of fraud and/or scams provided by the new Iowa Code § 553C.1004, Fareway believed Iowans using Bitcoin Depot's Bitcoin ATMs would be more adequately protected from the fraud and scams conducted through Bitcoin Depot's Bitcoin ATMs.

126.    Faced with Bitcoin Depot's persistent legal threats and with the new protections passed by the Iowa Legislature, Fareway plugged the Bitcoin ATMs back in on May 24, 2025.

127.    Nevertheless, on June 9, 2025, Bitcoin Depot initiated this action.

**COUNTERCLAIM COUNT I**
**(Declaratory Judgment)**

128.    Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and its exhibits as if set forth fully herein.

129.    Under 28 U.S.C. § 2201, this Court has jurisdiction to declare the legal rights and obligations of Fareway and Bitcoin Depot.

130.    Bitcoin Depot maintains that the MPA and MPAF constitute a valid and enforceable contract or agreement between Bitcoin Depot and Fareway.

131.    Relying on its purported rights under the MPA and MPAF, Bitcoin Depot, through its acts or omissions, has allowed its Bitcoin ATMs to be operated as instrumentalities of fraud and other activity that is illegal or prohibited under state and federal law and contrary to state and federal regulations.

132.    Upon information and belief, Bitcoin Depot knew or anticipated at the time that Bitcoin Depot and Fareway executed the MPA and the MPAF that its Bitcoin ATMs would be operated as instrumentalities of fraud and other activity that is illegal, prohibited, or otherwise contrary to law.

133.    Consequently, the MPA and MPAF were void ab initio and subject to rescission at law.

134.    Assuming *arguendo* that the MPA and MPAF were not void ab initio and that a valid contract existed between Fareway and Bitcoin Depot as set forth in the MPA and MPAF, the MPA and MPAF are still subject to equitable rescission because Bitcoin Depot used its purported rights under those agreements to allow its Bitcoin ATMs would be operated as instrumentalities of fraud and other activity that is illegal, prohibited, or otherwise contrary to law.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, declaring that the MPA and MPAF were void ab initio and therefore rescinded at law or alternatively, that the MPA and MPAF are equitably rescinded, awarding costs, and granting such other and further relief as the Court deems just and proper.

### COUNTERCLAIM COUNT II
### (Fraud)

135.    Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and its exhibits as if set forth fully herein.

136.    Bitcoin Depot made several representations at issue herein:

a.    That Bitcoin Depot operated its Bitcoin Depot ATMs in a "highly regulated" industry and that its Bitcoin ATMs and the transactions conducted through its ATMs were also highly regulated;

b.  That Bitcoin Depot had "robust compliance procedures" that made transactions conducted through its Bitcoin ATMs safe, secure and legal;

c.  That Bitcoin Depot's compliance team and compliance policies, procedures, and personnel were leading the industry in crypto regulations;

d.  That Bitcoin Depot's "robust compliance system" had:

    i.  Dedicated in-house compliance teams;

    ii.  Multiple state-of-the-art compliance management tools;

    iii.  Continuous training and development;

    iv.  Independent testing and updating of Bank Secrecy Act and Anti-Money Laundering practices; and

    v.  Rigorous customer due diligence on all transactions;

e.  That Bitcoin Depot, through its policies and procedures, ensured that transactions made through its Bitcoin ATMs were "safe and secure;"

f.  That Bitcoin Depot required all customers to complete Know Your Customer verification to prevent unauthorized or fraudulent transactions;

g.  That Bitcoin Depot complied with all relevant Know Your Customer and Anti-Money Laundering laws and regulations;

h.  That by following the Know Your Customer and Anti-Money Laundering laws and regulations, Bitcoin Depot was "doing its part" to prevent the use of Bitcoins purchased through its Bitcoin ATMs for illegal activities;

i.  That Bitcoin Depot ATMs have never been involved in any kind of fraudulent activity or scandal;

j.   That users could feel confident in their transactions with Bitcoin Depot because of its compliance system, procedures, policies and personnel;

k.   That hosts of Bitcoin Depot's Bitcoin ATMs could trust that Bitcoin Depot's "robust" compliance system would be a positive experience such that the host would see increased traffic come into their locations;

l.   That Bitcoin Depot would maintain Anti-Money Laundering, Know Your Customer, and Bank Secrecy Act compliance policies, procedures and programs;

m.   That Bitcoin Depot was in good standing and would be in good standing in all jurisdictions (including Iowa) without violation of applicable law, rule, regulation or other legal authority;

n.   That Bitcoin Depot would be exclusively responsible for all aspects of compliance with any local, state or federal law or regulation with regard to the operation of its Bitcoin ATMs in Fareway's stores.

137.   Bitcoin Depot's representations were false and/or materially omitted important facts and information, specifically including, but not limited to:

a.   That the Bitcoin ATM industry and Bitcoin Depot's operation of its Bitcoin ATMs were not "highly regulated" but instead were largely unregulated in substance with little to no government oversight of those operations or the transactions that were conducted through the Bitcoin ATMs;

b.   That Bitcoin Depot knew that its Bitcoin ATMs were frequently used by scammers to facilitate and process fraudulent and/or illegal scam transactions;

c.  That Bitcoin Depot knew how scammers were able to convince their victims into using Bitcoin Depot's Bitcoin ATMs to facilitate and process fraudulent and/or illegal scam transactions, specifically including, but not limited to, keeping constant cell-phone contact between the scammer and the victim so as to circumvent Bitcoin Depot's "robust" compliance system and warnings, and sending the victims the QR code of the scammer's digital wallet into which Bitcoin Depot would deposit the scammed Bitcoins;

d.  That Bitcoin Depot knew that its "robust compliance" policies, procedures, programs, personnel and warnings were either inadequate or unable to prevent scammers from using Bitcoin Depot's Bitcoin ATMs to facilitate and process fraudulent and/or illegal scam transactions;

e.  That Bitcoin Depot often failed to conduct appropriate due diligence on transactions conducted through its Bitcoin ATMs, and that such failure permitted scammers to facilitate and process fraudulent and/or illegal scam transactions through its Bitcoin ATMs;

f.  That the nature of cryptocurrency transactions and/or Bitcoin Depot's business model often prohibited Bitcoin Depot from "knowing its customer" because it could not objectively ascertain the owner of the digital wallet into which the Bitcoins purchased through its Bitcoin ATMs was the same person as the person depositing the cash into the Bitcoin ATM, thus permitting scammers to facilitate and process fraudulent and/or illegal scam transactions through its Bitcoin ATMs;

g.  That Bitcoin Depot's profited to a great extent by the fraudulent and/or illegal scam transactions conducted through its Bitcoin ATMs;

h.  That Bitcoin Depot's warnings to users about fraud and scam transactions were ineffective in preventing fraudulent and/or illegal scam transactions from taking place;

i.  That it was being investigated by the Iowa Attorney General for potential violations of Iowa law; and

j.  That a class action lawsuit had been initiated against Bitcoin Depot and Circle K Stores, Inc., its largest host of its Bitcoin ATMs, for Bitcoin Depot's failure, refusal, and/or inability to take reasonable steps to prevent fraudulent and/or illegal scam transactions conducted through its Bitcoin ATMs.

138.  Bitcoin Depot made its representations knowing that they were false.

139.  Bitcoin Depot made its representations for the purpose of and with the intention of causing Fareway and others to rely upon said representations to agree to place Bitcoin Depot's Bitcoin ATMs in Fareway's stores.

140.  Fareway reasonably relied upon Bitcoin Depot's representations in entering into the MPA and the MPAF.

141.  Had Bitcoin Depot disclosed the true extent of its knowledge that scammers were using its Bitcoin ATMs to facilitate and process fraudulent and/or illegal scam transactions, Fareway would not have entered into the MPA and MPAF.

142.  As a proximate result of Fareway's reliance upon Bitcoin Depot's misrepresentations in entering into the MPA and MPAF, Fareway has been damaged by Bitcoin Depot's misrepresentations.

143.     Because of Bitcoin Depot's misrepresentations, the MPA and MPAF should be rescinded and declared null and void.

144.     Bitcoin Depot's misrepresentations and omissions were made intentionally, with malice, were willful and wanton, and/or with reckless disregard for the rights and safety of others, including Fareway, and as such, punitive damages against Bitcoin Depot should be awarded to punish Bitcoin Depot for its actions and to deter Bitcoin Depot and other cryptocurrency kiosk operators from engaging in similar conduct.

145.     Fareway is entitled to punitive damages for Bitcoin Depot's conduct.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, including punitive damages, pre- and post-judgment interest, costs, and other civil remedies, including equitable remedies such as rescission and disgorgement, and for such other and further relief as the Court deems just and proper.

### COUNTERCLAIM COUNT III
**(Breach of Contract)**

146.     Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and its exhibits as if set forth fully herein.

147.     Bitcoin Depot maintains that the MPA and MPAF constitute a valid and enforceable contract or agreement between Bitcoin Depot and Fareway.

148.     Assuming *arguendo* that a valid contract existed between Fareway and Bitcoin Depot as set forth in the MPA and MPAF, Bitcoin Depot breached said contract, including, but not limited to, the following particulars:

a.  Failing to maintain effective anti-money laundering, Know Your Customer, and Bank Secrecy Act compliance programs, policies, procedures, and personnel so as to effectively detect and prevent the fraudulent and/or illegal scam activities from taking place through Bitcoin Depot's Bitcoin ATMs in Fareway's stores; and

b.  Violating applicable law, rule, regulation or other binding legal authorities, including, but not limited to:

    i.  Iowa's Consumer Fraud Act;

    ii.  Iowa's Ongoing Criminal Conduct statute; and/or

    iii.  Federal Bank Secrecy Act and its regulations.

149.    Bitcoin Depot's breaches of the MPA and MPAF pre-dated any act by Fareway alleged to have been a breach of the MPA by Fareway.

150.    Bitcoin Depot's breaches of the MPA and MPAF proximately caused damage to Fareway.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, pre- and post-judgment interest, costs, including equitable remedies such as rescission and disgorgement, and for such other and further relief as the Court deems just and proper.

## COUNTERCLAIM COUNT IV
### (Breach of Contract – Implied Covenant)

151.    Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and it exhibits as if set forth fully herein.

152.    Bitcoin Depot maintains that the MPA and MPAF constitute a valid and enforceable contract or agreement between Bitcoin Depot and Fareway.

153.    Assuming *arguendo* that a valid contract existed between Fareway and Bitcoin Depot as set forth in the MPA and MPAF, then the implied covenant of good faith and fair dealing inheres in the MPA and MPAF.

154.    The implied covenant of good faith and fair dealing requires that Bitcoin Depot's execution of its obligations, or exercise of any discretionary authority, must fall within the range of what the parties would have agreed upon during their original negotiations and must exhibit faithfulness to the express terms of the parties' agreement memorialized in the MPA and MPAF.

155.    The implied covenant of good faith and fair dealing prohibits Bitcoin Depot from engaging in arbitrary or unreasonable conduct which has the effect of preventing Fareway from receiving the fruits of the parties' agreement memorialized in the MPA and MPAF.

156.    In the MPA, Bitcoin Depot expressly represented that it was in good standing in all jurisdictions in which it operated and it would comply any local, state, or federal law or regulation relating to the operation of its Bitcoin ATMs.

157.    In the MPA, Bitcoin Depot also expressly represented that it would maintain anti-money laundering, Know Your Customer, and Bank Secrecy Act compliance programs.

158.    Implied within Bitcoin Depot's representation was that its compliance would be on-going and that its programs would be functional and enforced.

159.    Implied within the MPA and the MPAF are the following:

160.    Bitcoin Depot's represented programs would actually function;

161.    Bitcoin Depot's represented programs would be reasonably suited to their purpose;

162.    Bitcoin Depot's represented programs would be enforced;

163.    Bitcoin Depot would maintain reasonable procedures to address fraudulent activity;

164.    Bitcoin Depot would not willfully disregard evidence of fraud occurring through its Bitcoin ATM network;

165.    Bitcoin Depot would not, through its acts or omissions, allow its Bitcoin ATMs to be used for fraud or other illegal purposes; and,

166.    Bitcoin Depot would not, through its acts or omissions, expose Fareway to potential civil or criminal liability arising from fraud perpetrated on Fareway's customers or scams directed at those customers through Bitcoin Depot's Bitcoin ATMs.

167.    It would have been too obvious to demand the inclusion of express contractual terms in the MPA or MPAF that addressed each of the implied obligations listed in the preceding paragraph.

168.    Bitcoin Depot breached these implied obligations by maintaining demonstrably inadequate fraud detection systems, failing to investigate or respond to clear patterns of suspicious activity, permitting known bad actors continued access to its Bitcoin ATM network, and systematically prioritizing transaction volume over the implementation of basic anti-fraud measures that would have prevented or mitigated the scams at issue here.

169.    It would have been too obvious to demand the inclusion of an express provision.

170.    At the time of Bitcoin Depot's breaches, Fareway had fully performed all its obligations under the MPA.

171.    As a direct and proximate result of Bitcoin Depot's breach, Fareway has and will continue to suffer damages.

172.    Because of Bitcoin Depot's bad faith conduct, the MPA and MPAF should be rescinded and declared null and void.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, pre- and post-judgment interest, costs, including equitable remedies such as rescission and disgorgement, and for such other and further relief as the Court deems just and proper.

## COUNTERCLAIM COUNT V
### (Unjust Enrichment)

173.    Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and it exhibits as if set forth fully herein.

174.    Bitcoin Depot has been unjustly enriched because it received the benefits of the MPA and MPAF without honoring its corresponding obligations under the MPA and MPAF.

175.    Bitcoin Depot received the benefit of the MPA and MPAF, i.e., placement of its Bitcoin ATMs in Fareway's stores and all related revenue and other benefits.

176.    Bitcoin Depot has no justification for its failure to institute or maintain programs to deter fraud and money laundering, and to ensure compliance with all applicable laws and regulations.

177.    Fareway has been impoverished because Fareway has not received the full consideration due it under the MPA and MPAF and has instead incurred damages, including reputational damages and the costs of this litigation, as a result of Bitcoin Depot's unjust enrichment.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, pre-

and post-judgment interest, costs, and for such other and further relief as the Court deems just and proper.

## COUNTERCLAIM COUNT VI
### (Ongoing Criminal Conduct—Negligent Empowerment of Specified Unlawful Activity—in Violation of Iowa Code chapter 706A, et seq.)

178. Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and it exhibits as if set forth fully herein.

179. The salient acts complained of herein took place in the State of Iowa.

180. As such, Iowa law applies to Bitcoin Depot's actions that resulted in Bitcoin ATM transactions taking place in Fareway's stores located in the State of Iowa.

181. Iowa Code Chapter 706A is Iowa's ongoing criminal conduct statute.

182. Bitcoin Depot is the owner of Bitcoin ATMs located in Fareway stores and other locations within the State of Iowa.

183. Bitcoin Depot, through its ownership of Bitcoin ATMs located in Fareway stores and other locations within the State of Iowa, controls its Bitcoin ATMs.

184. Bitcoin Depot, through its ownership and control of Bitcoin ATMs located in Fareway stores and other locations within the State of Iowa, provides services to people using its Bitcoin ATMs to purchase Bitcoin.

185. Bitcoin Depot, through its ownership and control of Bitcoin ATMs located in Fareway stores and other locations within the State of Iowa, provides services to people who receive Bitcoins from the purchases of Bitcoins through Bitcoin Depot's Bitcoin ATMs.

186. Scammers frequently convince victims in Iowa to insert large amounts of cash into Bitcoin Depot's Bitcoin ATMs under false, fraudulent, and/or illegal scam pretenses, and upon

depositing said cash into the Bitcoin ATMs, the Bitcoins purchased from Bitcoin Depot are then deposited by Bitcoin Depot into digital wallets that are not owned or controlled by the victim.

187.    The actions, schemes, and scams conducted by the scammers constitute "specified unlawful activity" as such term is defined by Iowa Code § 706A.1(5) as their schemes amount to the indictable offenses of theft of property, fraudulent practices, and money laundering under Iowa law.

188.    Bitcoin Depot owes a duty to its hosts, including Fareway, and its users of its Bitcoin ATMs, including those who are victims of fraud and/or illegal scams, to take reasonable and sufficient measures to prevent its Bitcoin ATMs from being used by those who engage in fraudulent and/or illegal scam activity.

189.    Bitcoin Depot has breached its duties to hosts and its users by failing to take reasonable and sufficient measures to prevent its Bitcoin ATMs from being used by those who engage in fraudulent and/or illegal activity.

190.    Bitcoin Depot has knowledge that scammers are conducting "specified unlawful activity" through its Bitcoin ATMs in the manner described herein, i.e., by convincing Iowa victims to deposit large amounts of cash into Bitcoin Depot's Bitcoin ATMs under false, fraudulent and/or scam pretenses, using the cash to purchase Bitcoins from Bitcoin Depot, and then having Bitcoin Depot deposit the Bitcoins into a digital wallet owned or controlled by the scammer.

191.    Despite Bitcoin Depot's public representations that its Bitcoin ATMs and the transactions conducted through its Bitcoin ATMs are safe and secure, and that it has a "robust" compliance system, policies, procedures, and personnel to gain trust of hosts to its Bitcoin ATMS, including Fareway, and users of its Bitcoin ATMs that minimizes the risk of fraudulent and/or illegal scam transactions, and despite its knowledge of the manner in which these fraudulent and/or

illegal scam transactions take place, Bitcoin Depot's operations and business model does not contain sufficient safeguards to prevent the fraudulent and/or illegal scam transaction use of its Bitcoin ATMs.

192.    Bitcoin Depot is negligent in allowing property it owns and controls, i.e., its Bitcoin ATMs, and the services it provides in selling and transferring Bitcoins through its Bitcoin ATMs, to be used to facilitate and empower "specified unlawful activity" as conducted by the scammers.

193.    Bitcoin Depot's negligence in allowing its property, i.e., its Bitcoin ATMs, and the services it provides in selling and transferring Bitcoins through its Bitcoin ATMs, to be used to facilitate "specified unlawful activity" as conducted by the scammers is unlawful under Iowa Code § 706A.2(5).

194.    Bitcoin Depot's repeatedly facilitated and empowered the "specified unlawful activity" conducted by the scammers on a continuing basis generated substantial financial gain for Bitcoin Depot.

195.    Bitcoin Depot's negligence in allowing its property, i.e., its Bitcoin ATMs, and the services it provides in selling and transferring Bitcoins through its Bitcoin ATMs, to be used to facilitate "specified unlawful activity" as conducted by the scammers has proximately caused damage to Fareway, to the Iowa citizens who have been victimized by the fraudulent and/or illegal scams conducted through Bitcoin Depot's Bitcoin ATMs, and to the general economy and welfare of the State of Iowa.

196.    Fareway is entitled to recover for all reasonably foreseeable damages proximately caused by Bitcoin Depot as a result of its violation of Iowa Code § 706A.2(5) pursuant to Iowa Code § 706A.2(5)(b), including, but not limited to, damage to its reputation as caused by the presence of Bitcoin Depot's Bitcoin ATMs in its stores and the reasonable attorney fees, costs, and

expenses incurred by Fareway to defend itself from Bitcoin Depot's efforts to judicially force Fareway to plug the Bitcoin ATMs back in so as to permit Bitcoin Depot to continue its facilitation of unspecified unlawful activity.

197.    As a person whose business has been directly or indirectly injured by Bitcoin Depot's conduct in violation of Iowa Code Chapter 706A, Fareway is entitled to threefold its actual damages, pursuant to Iowa Code § 706A.3(7).

198.    Fareway is also entitled to recovery of all reasonable costs and expenses incurred in the investigation and prosecution of Bitcoin Depot and its negligent facilitation of specified unlawful activity, including reasonable attorney fees pursuant to Iowa Code §§ 706A.3(3)(d) and 706A.3(7).

199.    In addition to the monetary damages, costs, and expenses which Fareway is entitled as set forth *supra*, Iowa Code § 706A.3(3) provides additional equitable remedies and may grant additional relief by issuing an order placing reasonable restrictions upon Bitcoin Depot's future activities and/or prohibiting Bitcoin Depot from engaging in the same activities in which it engaged that caused a violation of Iowa Code Chapter 706A.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, including interest, attorney fees, costs, and other civil and equitable remedies as provided by Iowa Code Chapter 706A, including, but not limited to, appropriate orders to prevent, restrain, or remedy the Counterclaim Defendant's violations of Iowa Code Chapter 706A, and for such other and further relief as the Court deems just and proper.

## COUNTERCLAIM COUNT VII
### (False Advertising in Violation of 15 U.S.C. § 1125(a)(1)(B))

200.   Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and its exhibits as if set forth fully herein.

201.   This Court has jurisdiction over this Counterclaim IV under 15 U.S.C. § 1125(a)(1)(B) and 28 U.S.C. § 1331, as this Counterclaim IV arises under federal law.

202.   Fareway is a business entity engaged in commercial activities in Iowa, Illinois, Minnesota, South Dakota, Nebraska, Missouri, and Kansas.

203.   Bitcoin Depot is a business entity engaged in commercial activities in Iowa, Illinois, Minnesota, South Dakota, Nebraska, Missouri, Kansas, and several other states and countries, to wit operating Bitcoin ATMs through which it sells Bitcoin to Users.

204.   Bitcoin Depot has made false statements of fact about its goods and services provided through its Bitcoin ATMs, including but not limited to: "***In fact, Bitcoin Depot ATMs have never been involved in any kind of fraudulent activity or scandal***." *See* A (emphasis added).

205.   Bitcoin Depot's statement that its ATMs have "never been involved in any kind of fraudulent activity or scandal" is a demonstrably false statement of fact.

206.   In addition, Bitcoin Depot's other false statements are either false statements of fact or misleading claims that constitute false representations by implication or inuendo, including but not limited to:

    a.   Bitcoin Depot uses "cutting edge technology" to provide "secure" transactions;

    b.   Bitcoin Depot employs "robust" security measures to ensure that transactions are safe from threats because "getting past multiple layers [of security measures] doesn't happen often or with ease";

c.  Know Your Customer and Anti-Money Laundering regulations are integral to maintaining the integrity of the cryptocurrency industry, and that by adhering to those regulations, Bitcoin Depot provides trust and security to its customers;

d.  Bitcoin Depot requires customers to complete a Know Your Customer verification process which prevents unauthorized or fraudulent transactions;

e.  Bitcoin Depot complies with all know-your-customer and anti-money laundering regulations to ensure that its Bitcoin ATMs operate within legal boundaries; and

f.  Because Bitcoin Depot followed the know-your-customer and anti-money laundering regulations, "[i]n fact, Bitcoin Depot ATMs have never been involved in any kind of fraudulent activity or scandal."

207.    Bitcoin Depot's false and/or misleading statements actually deceived or have a tendency to deceive its customers, including, but not limited to, its customers who use its Bitcoin ATMs in Fareway's stores.

208.    Bitcoin Depot's false and/or misleading statements are material in that they are intended to and are likely to influence user decisions as well as Fareway's decision to allow Bitcoin Depot's ATMs in Fareway's stores.

209.    Bitcoin Depot's false and/or misleading statements were made in the stream of commerce, including, but not limited to, posting on its publicly available website: www.bitcoindepot.com and https://bitcoindepot.com/bitcoin-atm-info/security-and-trust-in-bitcoin-with-bitcoin-depot-btms/, and making presentations to marketplace participations. *See, e.g.*, Exs. A & B.

53

210.    Bitcoin Depot's false and/or misleading statements have caused or are likely to cause damage and harm to Fareway in the form of damage to Fareway's business reputation due to the fraudulent and/or illegal scam transactions taking place in Fareway's stores through Bitcoin Depot's Bitcoin ATMs.

211.    Injunctive relief is necessary to prevent Bitcoin Depot from making further false and/or misleading statements as set forth *supra*.

212.    Fareway is also entitled to monetary damages in the form of its lost revenues and profits resulting from damage to its business reputation, as well as monetary relief subject to the principles of equity under 15 U.S.C. § 1117, including disgorgement of up to three times the amount of Bitcoin Depot's profits derived from transactions conducted through Bitcoin Depot's Bitcoin ATMs located in Fareway's stores, including, but not limited to, those transactions that are the result of fraud and/or illegal scams, as well as the costs of this action and Fareway's reasonable attorney fees.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a/ Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, interest, costs, attorney fees and other civil remedies as provided by 15 U.S.C. § 1117 for the violations of 15 U.S.C. § 1225(a)(1)(B), including, but not limited to, appropriate orders to prevent, restrain, or remedy the Counterclaim Defendant's false and/or misleading statements, damages in an amount up to three times the Counterclaim Defendant's profits derived from transactions taking place through Bitcoin ATMs in Counterclaim Plaintiff's stores, and for such other and further relief as the Court deems just and equitable.

## COUNTERCLAIM COUNT VIII
### (Negligent Misrepresentation)

213.    Fareway realleges and incorporates by reference the allegations contained in the preceding paragraphs of the Counterclaim and its exhibits as if set forth fully herein.

214.    Bitcoin Depot, in the course of their business, profession, or employment, or in a transaction in which they have a pecuniary interest, supplied false information for the guidance of Fareway in their business transactions.

215.    Bitcoin Depot failed to exercise reasonable care or competence in obtaining or communicating the information.

216.    Fareway justifiably relied on the information supplied.

217.    Fareway suffered a pecuniary loss as a result of that reliance.

218.    Fareway is entitled to punitive damages for Bitcoin Depot's conduct.

WHEREFORE, the Counterclaim Plaintiff, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery, respectfully prays that the Court enter judgment in its favor and against the Counterclaim Defendant, Bitcoin Depot Operating LLC, for damages in an amount to be determined at trial, including punitive damages, pre- and post-judgment interest, costs, and other civil remedies, including equitable remedies such as rescission and disgorgement, and for such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

The Defendant and Counterclaim Defendant, Fareway Stores, Inc. d/b/a Fareway Meat and Grocery demand a trial by jury on all issues triable as of right.

**MORRIS JAMES LLP**

/s/ *K. Tyler O'Connell*

*COUNSEL PRO HAC VICE*:

K. Tyler O'Connell (#4514)
R. Eric Hacker (#6122)
Sarah M. Ennis (#5745)
Alena V. Smith (#6699)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
302.888.6800
toconnell@morrisjames.com
ehacker@morrisjames.com
sennis@morrisjames.com
asmith@morrisjames.com

David N. Fautsch
Elisabeth A. Tursi
FAUTSCH TURSI LLP
305 42nd Street
Des Moines, IA 50312
515-317-7483
david@fautschtursi.com
elisabeth@fautschtursi.com

*Attorneys for Defendant Fareway Stores, Inc.
d/b/a Fareway Meat and Grocery*

Dated: August 15, 2025